**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JAMES R. MONTEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 2:14cv0028 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W.

Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application

of James Montee (Plaintiff) for supplemental security income (SSI) under Title XVI of the

Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is before the undersigned United

States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for SSI on May 17, 2011, alleging he was disabled as of June 1, 2002,

because of anxiety, bipolar disorder, schizophrenia, multiple personality disorder, depression,

and a back injury. (R.[1] at 138-43, 156.) His application was denied initially and after a

hearing held in January 2013 before Administrative Law Judge (ALJ) Michael Comisky. (Id.

at 6-35, 40-68.) The Appeals Council denied Plaintiff's request for review, thereby effectively

adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with
her answer.

**Testimony Before the ALJ**

Plaintiff, represented by counsel, and Denise Waddell, a vocational expert, testified at the administrative hearing. Before any testimony was taken, Plaintiff amended his alleged disability onset date to be the date he filed for SSI.

Plaintiff testified that he lives with his mother,[2] completed the ninth grade, and has a General Equivalency Degree (GED). (Id. at 45.) His mother is seventy-three years old, can take care of herself, and reminds him to take his medications. (Id. at 48.) She drove him to the hearing.[3] (Id.) His caseworker reminds him to go to appointments. (Id.) He has five children; three are under the age of eighteen. (Id. at 51.) Two of the three are daughters and live with his sister. (Id.) The third is a son and is in foster care. (Id.)

Plaintiff had two jobs that the ALJ inquired about. One was working at Archer Tool Company as an assembler of small parts for welding equipment. (Id. at 46.) This job was half sitting, half standing and required that he lift nothing heavier than twenty pounds. (Id.) His job as a cook at Chariton Nursing Care, Incorporated, required that he lift twenty-five pounds. (Id. at 47.) Plaintiff cannot return to either job because he began to hear voices and think others were talking about him behind his back. (Id.)

Plaintiff tried doing some computer repair work, but was slow and had difficulty comprehending what needed to be done. (Id. at 42.) He also tried working at a service station, but was fired after three days. (Id. at 57-58.)

---

[2]Plaintiff stated that he had been living with his brother.

[3]Plaintiff's driver's license has been suspended for back-owed child support.

Asked when he stopped drinking, Plaintiff replied that it was in May 2010 or 2011, explaining that his memory was poor. (Id. at 47.) Plaintiff had been hospitalized in May 2011 for a week after relapsing and drinking whiskey. (Id. at 49.) He has not used alcohol since. (Id.) The hospitalization was followed by inpatient rehabilitation. (Id.) Plaintiff is unable to attend AA meetings because he has a problem being "in a close space with a certain amount of people." (Id. at 50.)

Plaintiff has post-traumatic stress disorder (PTSD) due to his children being taken away from him. (Id. at 52.) He also has bipolar disorder, schizophrenia, and manic disorder. (Id. at 52-53.) He cannot concentrate on anything for longer than ten minutes. (Id. at 53.) He has periods when he uses the computer at the library to go on dating websites to find someone to talk to. (Id. at 54.) Approximately once a month for a two to three day period, he is depressed and lies in bed all day. (Id.) He has difficulty sleeping. (Id. at 56.) At least once a week, he has days where his mind races and he cannot concentrate. (Id.) Approximately one year earlier, he had a seizure. (Id. at 58.) This was thought to be due to his medication and has not occurred again. (Id.)

Plaintiff has difficulty going out in public because he thinks people are staring at him. (Id. at 55.)

Plaintiff takes Celexa (an antidepressant), Invega (used to treat schizophrenia), Seroquel (an antipsychotic), BuSpar (an anti-anxiety medication), ranitidine (to reduce stomach acid), Vistaril (a sedative), and other medications. (Id. at 55-56.)

Ms. Waddell, testifying without objection as a vocational expert (VE), described Plaintiff's past relevant work as a small parts assembler as light and unskilled. (Id. at 59.) His work as a cook was medium and skilled. (Id.)

She was then asked by the ALJ to assume a hypothetical claimant of Plaintiff's age (43 at the time of the hearing), education, and past work experience who can understand, remember, and carry out simple work instructions; who can have frequent contact with supervisors and coworkers but only occasional contact with the general public; who cannot work around unprotected heights or dangerous machinery; and who cannot use motorized driving equipment as a primary job duty. (Id.) Asked if this hypothetical claimant can perform Plaintiff's past relevant work, the VE replied that he can work as a small parts assembler but not as a cook. (Id.) He can also work at such jobs as a linen room attendant, a lamination assembler, and a counter supply worker. (Id. at 60.) If this person has "no useful ability to follow work rules, use judgment, deal with work stresses, . . . [and] behave in an emotionally stable manner or relate predictably in social situations," these jobs were not be available. (Id.) If once a week this person will not be able to concentrate for longer than twenty minutes, these jobs are not available. (Id. at 60-61.) Nor are the jobs available if the person will miss work two to three days a month due to symptoms of depression. (Id. at 61.)

The VE further stated that her testimony is consistent with the *Dictionary of Occupational Titles* and with the *Selected Characteristics of Occupations*. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ includes forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, and assessments of his mental residual functional capacities.

Plaintiff reported on a Disability Report that he stopped working on November 1, 2002, because of his condition.[4] (Id. at 156.) He worked as an assembler from May 1999 to June 2000. (Id. at 157.) From 2006 to 2009, he was self-employed and did computer repair for one hour a day for two days a week. (Id.) He earned $1.00 at this job. (Id.)

On a Function Report, Plaintiff described what he does during the day. (Id. at 173.) He makes coffee, reads the newspaper, takes his medication, watches the news on the computer, sometimes eats, and then goes to bed. (Id.) He does not take care of anyone else or of any pets. (Id. at 174.) He does not go outside often, does not go to the store, and does not sleep well. (Id.) He does not have any problems taking care of his personal grooming or hygiene. (Id.) His impairments adversely affect his abilities to lift, squat, bend, stand, walk, sit, kneel, talk, remember, concentrate, understand, climb stairs, follow instructions, get along with others, and complete tasks. (Id. at 178.) He cannot walk farther than two blocks before having to stop and rest for five to ten minutes. (Id.) He gets along very well with authority figures. (Id. at 179.) He takes a cane with him in case his back gives out. (Id.)

---

[4] A Report of Contact form describes a telephone conversation during which Plaintiff reported that he felt "overwhelmed" with filling out the various forms and was going to see until he saw his psychiatrist the next month to get help during so. (Id. at 199.) The disability worker replied that it was preferable that the forms be received sooner and offered to help over the telephone to fill them out. (Id.) Plaintiff called four days later to report he had completed the forms and was sending them in. (Id.

An interviewer noted that Plaintiff answered questions without any difficulty. (Id. at 153.)  Plaintiff explained, however, that he had memory problems so he could not give exact dates for past treatment.  (Id.)  He also explained that the only one of his four prescribed medications that he was taking was Celexa; he could not afford the others.  (Id.)

An earnings record reflects that Plaintiff worked for Archer Tool Company in 1999, earning $4,962.30,[5] and in 2000, earning $2,431,40. (Id. at 144.)  He had earnings from 1985 to 1995, inclusive, and in 1999 and 2000.  (Id. at 145-46.)  His annual earnings never exceed $8,000.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order beginning with a master treatment plan developed in August 2009[6] for Plaintiff at the North Central Missouri Mental Health Center (North Central) when he was diagnosed with generalized anxiety disorder and alcohol dependence. (Id. at 323-27.)  His current Global Assessment of Functioning (GAF) was 40.[7]  (Id. at 323.)  He had a history of anxiety and

---

[5]All amounts are rounded to the nearest dollar.

[6]A June 2009 record from Preferred Family Healthcare was also before the ALJ. (Id. at 229.) This one-page "Discharge Summary" lists an admission date of March 25, 2009, and describes the treatment as "unsuccessful." (Id.)  The treatment was required as part of a stipulation by the Division of Family Services (DFS) for Plaintiff to regain custody of his children.  (Id.)  He was reported to have not remained engaged in treatment, to have continued to use marijuana and alcohol, and to have missed appointments.  (Id.)   He would admit problems at one session and then deny those admissions at the next session.  (Id.)  He showed signs of paranoia and admitted to hallucinations. (Id.)

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment

symptoms of obsessive-compulsive disorder.  (Id. at 326.)  His and his wife's children had been removed from their home due to an infestation of fleas and tics.  (Id.)  They were seeing a counselor.  (Id.)  The report referred both to Plaintiff continuing to drink and to not drinking.  (Id. at 326, 327.)  He was self-employed doing computer work.  (Id. at 327.)  He drank two to five cups of coffee a day and did not sleep well.  (Id.)  The psychiatrist, Henry J. Wisdom, D.O., diagnosed Plaintiff with anxiety disorder and prescribed Lexapro (an antidepressant).  (Id.)  A treatment objective was for Plaintiff to have no exacerbation of his signs and symptoms for three months.  (Id. at 324.)  To achieve this objective, he was to take the prescribed medications, to keep doctor appointments, and to report any side effects or exacerbation of signs and symptoms.  (Id. at 324-25.)

The following month, Plaintiff went to the emergency room at Moberly Regional Medical Center (MRMC) for numbness in his entire body for the past three to four months that had recently spread to his right hand.  (Id. at 233-40.)  Also, he had recently recovered from the flu, but had developed a cold and leg pain.  (Id. at 236.)  He was taking Lexapro. (Id. at 236.)  His medical history was significant for anxiety, back problems, alcohol abuse, and stomach ulcers.  (Id.)  He was given a script for a magnetic resonance imaging (MRI) of his brain and cervical spine.  (Id. at 239.)  He was diagnosed with paresthesia and discharged in stable condition within an hour of being seen and instructions to follow up with a Dr. Kahn after getting the MRI results.  (Id. at 237, 240.)

---

in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV-TR at 34 (emphasis omitted).

Three days later, Plaintiff was admitted to the University Hospital, explaining that he did not have the ability to schedule an MRI.  (Id. at 241-69.)  It was revealed that he occasionally heavily drank.  (Id. at 241.)  Alcohol cessation was recommended.  (Id.)  He reported both that the numbness was not exacerbated by anything and that it was exacerbated by exertion.  (Id. at 247, 248.)  It was mitigated by rest.  (Id. at 248.)  Physical examination findings were normal, including his gait and cognitive function, with the exception of having coarse breathing sounds and tachycardia (a faster than normal heart rate at rest).  (Id. at 248-49.)  Also, he had sensory deficits consistent with his complaints.  (Id. at 258.)  He was alert and oriented to time, place, person, and situation; had fluent speech; and intact naming, reading, calculation, repetition, and recall.  (Id. at 257-58.)  He smoked one pack of cigarettes a day.  (Id. at 248.)  An MRI of his cervical spine and of his thoracic spine were performed and were unremarkable.  (Id. at 244, 266-67.)  A computed tomography (CT) scan of his head showed no intracranial hemorrhage, mass, or evidence of a recent infarct, but did reveal a moderate to severe sinus inflammation.  (Id. at 265.)  A chest x-ray showed no acute cardiopulmonary findings.  (Id. at 269.)  Plaintiff was diagnosed with numbness and alcohol abuse.  (Id. at 245.)  The next day, he refused to undergo two recommended tests, including an electromyogram (EMG), and requested to be discharged.  (Id. at 241, 260.)  He was advised to stop drinking.  (Id. at 241.)  At his request, a follow-up appointment was not scheduled. (Id. at 246.)

Plaintiff again saw Dr. Wisdom on October 27, reporting he was doing as well as possible.  (Id. at 328.)  The small dosage of Lexapro was apparently sufficient to control his

anxiety, fears, and panic.  (Id.)  He was calmer, felt more reassured, and was continued on his medications.  (Id.)

At Plaintiff's next, January 2010 visit, Dr. Wisdom increased the dosage of Lexapro in case Plaintiff was tempted to drink.  (Id. at 329.)  His prognosis was guarded due to "his long history of alcohol abuse."  (Id.)

In February, Plaintiff was taken by ambulance to the emergency room at Pershing Memorial Hospital after falling at the grocery store and hitting his head.  (Id. at 274-88.) Plaintiff informed the ambulance crew that the had had a seizure.  (Id. at 288.)  A CT scan of his brain and skull showed soft tissue swelling of the scalp in the left occipitoparietal region and pansinusitis.  (Id. at 281.)  Otherwise, it was normal.  (Id.)  Plaintiff was diagnosed with a contusion and sinusitis; prescribed Zofran (an anti-nausea medication), Ativan (an anti-anxiety medication), and Cipro (an antibiotic); and discharged.  (Id. at 282.).

In July, Plaintiff was seen at the MRMC emergency room for complaints of leg pain for the past two to three weeks that was recently worse after he bumped his back on the car door.  (Id. at 291-300.)  On a ten-point scale, the pain in his legs was a ten.  (Id. at 294, 295.) Plaintiff explained that he is an alcoholic – he drinks a fifth of whiskey a day – and has seizures if he does not drink.  (Id. at 294, 295, 299.)  Even when drinking, he had night tremors.  (Id. at 294.)  He walked with a cane.  (Id. at 292.)  He had taken ibuprofen the day before.  (Id. at 294.)  He was described as not being a good historian.  (Id. at 299.)  He and his

wife were seeing a psychiatrist every month. (Id.) Tests revealed an ethanol level of 336.[8] (Id. at 300.) Plaintiff was admitted to the hospital with diagnoses of acute alcohol intoxication, alcohol withdrawal syndrome, and alcohol-induced neuropathy. (Id. at 297.) On admission, he was intoxicated, tremulous, and had "some paranoid delusions." (Id.) He had a normal mood and affect and slow cognition. (Id. at 300.) He was rehydrated with intravenous (IV) fluids, detoxified, and seen by a physical therapist. (Id. at 297, 300.) Chest x-rays were unremarkable. (Id. at 318.) He remained unsteady with a wide stance gait and had a tendency to fall backwards when standing from a seated position. (Id. at 297.) He was discharged on July 12 with diagnoses of alcohol intoxication, alcohol withdrawal syndrome, alcohol myopathy and weakness with ataxic gait; abnormal transaminases and thrombocytopenia (low platelet count) due to chronic alcohol abuse; and nicotine dependence. (Id.) His only prescription medication was Celexa. (Id.) He was to see his primary care physician within two weeks and was encouraged to exercise, comply with his medication regimen, and stop smoking and drinking. (Id.) He declined a referral to a rehabilitation unit or to outpatient physical therapy. (Id. at 298.)

In November, Plaintiff consulted the health care providers at Burrell Behavioral Health (Burrell) because he wanted to get back on Celexa. (Id. at 367-69.) He had been off of it for four months because he could not afford it; DFS had been, and was no longer, paying for his

---

[8]In most jurisdictions in the United States, a level of 80 mg/dL is prima facie evidence of being under the influence of alcohol for purposes of driving a motor vehicle. Mayo Clinic, Test ID: Ethanol, Blood, http://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive (last visited Jan. 27, 2015). A level equal to or greater than 400 mg/dL is potentially lethal. Id.

medications and his "psych visits." (Id. at 367.)  He had not drunk alcohol for the past six months.  (Id. at 368.)  On examination, he was alert and oriented to time, place, and person; initially had poor eye contact, but improved with conversation; had a depressed mood and flat affect; was of average intelligence; had minimal problems with dates and memory recall; had fair judgment and insight; spoke articulately; and had logical and coherent thoughts with a negative connotation.  (Id.)  His symptoms included a low mood, low self-esteem, anxiety when in public, and paranoia.  (Id.)  He was diagnosed with mood disorder, not otherwise specified, and alcohol and marijuana dependence, each in early remission.  (Id.)  His current GAF was 51.[9]  (Id.)  Plaintiff was referred to the Family Health Center for medication management and advised to attend AA (Alcoholics Anonymous).  (Id.) 369.)

In January 2011, Plaintiff terminated the services from North Central.  (Id. at 330-32.)

In May, Plaintiff was admitted from the emergency room to University Hospital for alcohol intoxication.  He had a history of alcohol intoxication with suicidal ideation and had thoughts of setting his house on fire when intoxicated.  (Id. at 335-48.)  He was going through a divorce, his girlfriend had left him, his children were in foster care, and he was unemployed.  (Id. at 335, 338.)  He had been binge drinking for the past four days, drinking one-fifth of whiskey every day.  (Id.)  His blood alcohol level was greater than 250.  (Id.)  His longest period of sobriety was a month, and that was several months earlier.  (Id. at 341.)  He

---

[9] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

intermittently worked on fixing computers.  (Id.)  He smoked one pack a cigarettes a day, and had done so for fifteen years.  (Id. at 338, 342.)  He denied auditory hallucinations but had visual ones of seeing shadows in the corner of his eyes.  (Id. at 341.)  The hallucinations were not affected by his drinking.  (Id.)  He had obsessive compulsive traits of touching and checking to make sure the refrigerator door was closed, and felt the traits were getting worse.  (Id.)  He did not like crowds and did not like meeting new people.  (Id.)  He had daily panic symptoms that lasted a few seconds.  (Id.)  He had always been paranoid, worried, and anxious.  (Id.)  He denied having PTSD.  (Id. at 342.)  He had had more suicide attempts than he could remember, but had had no hospitalizations.  (Id.)  He had recently stopped taking his medications for bipolar disorder and schizophrenia.  (Id. at 339.)  A review of his physical systems was normal.  (Id.)  His mental status examination revealed a normal, disheveled appearance; an anxious and severely depressed mood; a flat and blunted affect; a mild impairment in memory; and fair insight and poor judgment.  (Id. at 344-45.)  He was diagnosed with alcohol dependence; major depressive disorder, recurrent, severe, with psychotic symptoms; and generalized anxiety disorder.  (Id. at 345.)  He was prescribed trazodone and Prozac and transferred two days later to another facility for in-patient psychiatric treatment.[10]  (Id. at 335, 345.)

In July, on referral of the psychiatric facility and after a diagnosis of major depressive disorder, Plaintiff had an intake assessment for Burrell Behavioral Health.  (Id. at 353-66, 446-59.)  He reported that he was depressed and had mood swings.  (Id. at 353.)  He was

---

[10]There were no records of such treatment before the ALJ.

hearing voices telling him he was worthless.  (Id.)  He was divorced and had broken up the

past April with a girlfriend after a four-month relationship.  (Id.)  He reported he had been

diagnosed with bipolar disorder, but could not recall the source of the diagnosis; has had

multiple personalities since the age of twenty; and had heard voices and had feelings of

paranoia since approximately the age of twelve.  (Id. at 353, 354.)  He was not currently

receiving any psychiatric treatment and had been hospitalized for mental health treatment.  (Id.

at 354.)  He was taking Celexa and found it to be of benefit, but had taken his last pill that

morning.  (Id. at 354, 366.)  He had started drinking at the age of twelve, had abused alcohol

until October 2010, had gotten drunk once in April 2011, and was not currently drinking.  (Id.

at 355, 360.)  He was obsessively using dating sites.  (Id. at 355, 357.)  He had applied for

SSI, but his goal was to get back to work.  (Id. at 357.)  He had recently worked at a gas

station but had quit after a few days because it was "'too stressful.'"  (Id. at 359.)  The

examiner noted that Plaintiff was unkempt, coordinated, had no difficulty attending to the

examiner, and was oriented to time, place, person, and situation.  (Id. at 361.)  The examiner

also "question[ned] the authenticity of [Plaintiff's] symptoms and the truthfulness in

reporting."  (Id. at 353.)  He did not have any problems with his memory, but his "speech was

often illogical and tangential."  (Id. at 362.)  The examiner was not sure about how accurate

a historian Plaintiff was, including having multiple personalities, and noted that "[h]e

appeared very nervous, fidgeting constantly."  (Id.)  The examiner opined that Plaintiff

struggled with his addiction and depression and appeared to lack motivation to succeed in

treatment.  (Id. at 363.)  Plaintiff was diagnosed with major depressive disorder, recurrent, and alcohol and cannabis dependence.  (Id. at 365.)  His GAF was 45.[11]  (Id. at 366.)

On July 12, Plaintiff saw Forest Conley, D.O., to establish care.  (Id. at 374.)  Plaintiff reported he had been out of his medications for a week and was becoming depressed.  (Id.)  He had a long history of depression and, because of his back pain, suffered from insomnia.  (Id.)  He was diagnosed with depression, given a prescription for Celexa, and referred for mental health treatment.  (Id.)

The following week, a treatment and rehabilitation plan was developed for Plaintiff at Burrell.  (Id. at 437-45.)  His primary diagnosis was major depression disorder; additional diagnoses were alcohol and cannabis dependence.  (Id. at 437.)  His goals were to improve his psychiatric and physical health stability; to learn to manage his anxiety and depression; to improve his self-esteem; and to increase his independence through employment and housing.  (Id.)

In August, Plaintiff saw Justin Blount, M.D., a psychiatrist at Burrell.  (Id. at 395-97, 466-68.)  Plaintiff reported he had multiple personalities and a history of paranoia and of manic behavior.  (Id. at 395.)  Dr. Blount noted that Plaintiff stated he was "hyper" but Dr. Blount did not feel he appeared so.  (Id.)  Plaintiff reported he had a history of wrecking vehicles, thought he could fly, and had panic attacks, during which he had tunnel vision.  (Id.)

---

[11]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34 (emphasis omitted).

He was frequently nervous, had difficulty concentrating, and could not sleep. (Id.) He had visual hallucinations of seeing shadow people and auditory hallucinations of hearing music in his head. (Id.) He had been beaten and sexually abused as a child. (Id.) He had been prescribed Celexa when in the hospital, but was not currently taking it. (Id. at 396.) He last was drunk in April 2011. (Id.) He was not currently drinking and was not taking any medications. (Id.) He was applying for disability. (Id.) He had had "[s]ignificant marijuana use in the past," began drinking "significantly" around age twelve, and had "tried meth." (Id.) He was "using multiple dating sites and ha[d] multiple girlfriends" on those sites. (Id.) He did not, however, have any intention of or desire to meet any of the people he was meeting online. (Id.) On examination, he had a slightly disheveled appearance; normal speech; a slightly labile and irritable mood; a circumstantial and tangential thought process; and poor judgment. (Id. at 396-97.) He was alert and oriented. (Id. at 397.) He "appear[ed] to have paranoid delusions as well as grandiose delusions when manic." (Id.) He was diagnosed with schizoaffective disorder, bipolar type, and a history of alcohol and cannabis dependence. (Id.) His current GAF was 40. (Id.) He was prescribed Invega, Celexa, and Ambien (a sedative). (Id.)

When he next saw Dr. Blount, in October, Plaintiff informed him that he had started drinking for a short period. (Id. at 398-99, 469-70.) He thought the government was watching him and people were jealous of him. (Id. at 398.) He had dreams "[a]bout selling things, which he is doing in real life." (Id.) He had a child support hearing the next month.

(Id.) He had a "somewhat flat" affect and talked nonstop. (Id.) His dosage of Invega was increased; his other medications were continued. (Id.)

In December, Plaintiff reported to Dr. Blount that he was more anxious and depressed. (Id. at 400-01, 471-72.) He had to go to AA and approved substance abuse counseling before the court would allow him to see his children; he had not done either yet. (Id. at 400.) The child support hearing had gone "well[;] it got continued." (Id.) He tried to avoid people. (Id.) He was depressed and anxious and had a flat affect. (Id.) He was prescribed Celexa and Seroquel and told to cut out caffeine. (Id.)

In January 2012, Plaintiff was evaluated at Burrell by Emily Crawford, Ph.D. (Id. at 402-11.) He appeared alert, pleasant, polite, forthright, and cooperative. (Id. at 402.) He was alert and oriented to time, place, and person, and appeared to be intelligent and have a sense of humor. (Id.) He was talkative and went off on tangents, sometimes forgetting the question. (Id.) He had a blunt affect, minimal eye contact, and a "somewhat anxious" mood. (Id.) He took Celexa, Seroquel, and Invega. (Id. at 403.) Other than back pain, he had no physical problems. (Id.) He had never tried to commit suicide. (Id.) He had mood swings that lasted for weeks. (Id.) His depressive episodes use to last for weeks and now only lasted for days. (Id.) His manic episodes used to occur every day but now occurred two days at most. (Id.) He slept for four, non-consecutive hours a night. (Id.) He attributed his anxiety to an event that happened when he was twelve – a group of males jumped him and took his bicycle. (Id.) He has panic attacks at home for no apparent reason. (Id. at 404.) He had been bullied since the age of eight. (Id.) He last worked five years earlier. (Id.) He lives with his mother and

serves as her caretaker.  (Id. at 406.)  She has chronic obstructive pulmonary disease and is

senile.  (Id.)  He has been sober since October 2010 with the exception of being intoxicated

in April 2011.  (Id.)  Plaintiff was given several tests, the results of which were described by

Dr. Crawford as follows.

> Results of this assessment . . . provide confirmatory evidence for previously
> assigned diagnosis of Major Depressive Disorder, Recurrent.  James appears to
> struggle with pervasive feelings of worthlessness and poor self-image.  His
> estranged relationships with his children appear to exacerbate his depressive
> symptoms.  He expressed knowledge of the steps that would need to be taken
> to improve these relationships, but he also expressed ambivalence about
> completing these steps.    James's tendency to be passive and to shirk
> responsibilities may stem from apathy and fatigue.  Alternatively, his passivity
> and affective unresponsiveness may reflect an attempt to restrain underlying
> anger, anxiety, and depression.
>
> Further diagnostic clarity is not possible at this time due to James's tendency to
> readily endorse any perceived problems, to the degree that one of the measures
> in this assessment[12] was invalid.  This pattern of responding may reflect that he
> is experiencing an especially distressing degree of emotional turmoil, and/or an
> attempt to portray oneself as especially symptomatic.  James reported that he
> has previously been diagnosed with Bipolar Disorder.  He endorsed past
> symptoms that could characterize a history of manic episodes.  In addition, it
> is possible that some of the symptoms that are currently conceptualized as part
> of a long-standing personality pattern actually reflect some symptoms of a mood
> disorder. . . .

(Id. at 410 (footnote added)).  She diagnosed Plaintiff with PTSD; Major Depressive Disorder,

recurrent, per records; and alcohol and cannabis dependence in sustained full remission.  (Id.)

Schizoaffective disorder was to be ruled out.    (Id.)    His GAF was 45.    (Id.)    She

---

[12]The Minnesota Multiphasic Personality Inventory – 2 – Restructured Form. Also, Plaintiff's
responses on the Trauma Symptom Inventory were to "interpreted with caution, as [Plaintiff] tended
to endorse most symptoms."  (Id. at 408.)  His results on the Millon Clinical Multiaxial Inventory
were also to "be interpreted with caution, as his response pattern indicates that he tended to readily
endorse any perceived problems."  (Id. at 407.)

recommended, among other things, that he participate in regular treatment appointments. (Id. at 410-11.)

The next month, Plaintiff reported to Dr. Blount that he was "'[d]oing fairly well.'" (Id. at 473-74.) His depression was not as bad as before and he was not as paranoid as before. (Id. at 473.) He was living with his mother and was concerned that he would return to drinking if he lived alone. (Id.) He did not attend the court approved substance program, but was doing a program online. (Id.) His court case was continued again and may be until "he gets his disability." (Id.) He continued to see shadows occasionally. (Id.) He wanted Dr. Blount to find him a girlfriend. (Id.) On examination, he was alert, had a "somewhat flat" affect, reported he was depressed and anxious, and talked nonstop. (Id.) His Seroquel dosage was increased; his other medications were continued. (Id.)

At his next scheduled Burrell appointment, on May 4, Plaintiff was seen by Andrea Earlywine, A.P.N., C.N.S., R.N. (Id. at 475-76.) Plaintiff reported that he was doing well with the exception of a few days a month when he becomes more manic, paranoid, and anxious. (Id. at 475.) His depression was stable and was usually a three on a ten-point scale. (Id.) There was stress at home due to his mother's financial issues. (Id.) He had visited a woman he had met over the internet for a week and she was getting ready to visit him the next month. (Id.) He was not as pleased about being in a relationship as he thought he would be. (Id.) He was compliant with his medications; there were no side effects. (Id.) On examination, he had an anxious mood, reactive affect, fair to good insight and judgment, a grossly intact memory, good eye contact, normal speech, and a linear and abstract flow of

thought.  (Id. at 476.)  He was alert and oriented to time, place, and person.  (Id.)  Ms.

Earlywine noted that his diagnosis of schizotypal personality disorder[13] was provisional

pending psychological testing.  (Id.)  His GAF was 54.  (Id.)  BuSpar was added to his

medications.  (Id.)

Plaintiff was seen at Burrell on July 13 by Jairam Das, M.D.  (Id. at 477-78.)  Plaintiff

reported that he had been having difficulty sleeping and urinating and was feeling confused

during the day.  (Id. at 477.)  He thought these problems might be side effects of his

medications.  (Id.)  On examination, he was cooperative and had good eye contact, normal

speech, a euthymic mood and congruent affect, linear and goal-directed thought processes,

intact memory, and fair insight and judgment.  (Id. at 478.)  Dr. Das diagnosed Plaintiff with

schizoaffective disorder, PTSD, and alcohol and marijuana dependence, each in sustained full

remission.  (Id.)  His GAF was 60.  (Id.)  He decreased Plaintiff's dosage of Seroquel, started

him on prazosin (used to treat hypertension), and continued him on his other medications.

(Id.)

Two days later,  Plaintiff was taken by ambulance to the emergency room at MRMC

after his mother witnessed him having a seizure.  (Id. at 419-22, 425-31.)  He was given

Dilantin and admitted for observation.  (Id. at 420.)  His medications included Invega,

Seroquel, Celexa, Zantac (the brand form of rantidine), and Minipress (the brand form of

prazosin).  (Id.)  On examination, he appeared to be "fairly appropriate," but tired.  (Id. at

---

[13]"Schizotypal Personality Disorder is a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior."  DSM-IV-TR at 697.

421.)  His urinary analysis, brain CT scan, and alcohol and drug levels were insignificant.  (Id. at 421, 431.)  It was undecided whether he had had a pseudoseizure or a true seizure.  (Id. at 421.)  He was discharged the next day in stable condition.  (Id.)

On July 25, Plaintiff consulted Iqbal Khan, M.D., a neurologist, about the seizure.  (Id. at 412-13.)  His alcohol level was low; Plaintiff reported he had been sober for a couple of years.  (Id. at 412.)  He had run out of the Dilantin given him for his seizures.  (Id.)  On examination, Plaintiff was pleasant, cooperative, alert, and oriented to time, place, and person.  (Id. at 413.)  He had full motor strength and 2/4 reflexes in all his extremities.  (Id.)  His gait was unremarkable; he could tandem walk.  (Id.)  Dr. Kahn recommended an MRI of the brain and anti-epileptic medication.  (Id.)  Plaintiff was started on Keppra and was to return in one month.  (Id.)

Two days later, Plaintiff's Burrell assessment was updated.  (Id. at 460-65, 479-87.)  Dr. Das was the consulting psychiatrist.  (Id. at 465.)  Plaintiff reported that his depression had improved to the extent he was going to bed depressed approximately only two days a month.  (Id. at 460.)  His manic episodes, during which he stays up for several days and does not leave his mother's house, continued but had decreased in frequency.  (Id.)  Also continuing were his irritability, feelings of worthlessness, and auditory and visual hallucinations.  (Id.)  He continued to have several alter egos, although the disrespectful, selfish, and easily irritated ego had not surfaced for at least a year.  (Id.)  His sleep was irregular; his short term memory was poor.  (Id.)  His diagnoses included major depressive disorder, recurrent, moderate; alcohol

and cannabis dependence; PTSD; and schizotypal personality disorder.  (Id. at 462-63.)  His GAF was 35.  (Id. at 464.)

On August 2, Plaintiff had an eye exam by Rashed Nizam, M.D., for hyperopia (farsightedness) and suspected glaucoma.  (Id. at 492-96.)

On August 20, Dr. Kahn noted that the MRI of Plaintiff's brain was unremarkable except for an apparently-benign venous enlargement of the right posterior convexity.  (Id. at 414, 423-24, 432-33.)  Plaintiff was taking the Keppra, had not had any seizures, and had no new complaints. (Id. at 414)  A brief neurological examination was normal.  (Id.)  The Keppra dosage was doubled.  (Id.)

The next day, Plaintiff returned to Dr. Nizam, underwent a prophylactic peripheral iridotomy of the right eye (a procedure to address glaucoma) and was prescribed Flarex to treat eye swelling.  (Id. at 497-500.)  The same procedure was performed on his left eye the next month.  (Id. at 502-06.)

Plaintiff reported to Dr. Das on September 28 that he was continuing to have problems sleeping.  Dr. Das noted that Plaintiff had telephoned after his last visit, reporting that he was unable to sleep on the lower dose of Seroquel.  (Id. at 488.)  Vistaril was added. (Id.)  Plaintiff explained that sometimes he slept more than usual and sometimes less.  (Id.)  He was educated about sleep hygiene and exercise.  (Id.)  On examination, he was as before with the exception

his mood was bored. (Id. at 489.) His diagnoses and prescriptions[14] were unchanged. (Id.) His GAF was 50. (Id.)

In November, Plaintiff reported to Dr. Khan that he was "doing really good." (Id. at 415.) He was compliant with his medication. (Id.)

Also before the ALJ were assessments of Plaintiff's mental residual functional capacities.

In February 2009, at the request of his caseworker, Plaintiff underwent psychological testing and assessment by Frederick W. Nolen, Ph.D. (Id. at 220-26.) Plaintiff reported that he had begun drinking alcohol when he was twelve, had a DWI charge in 2001, and smoked marijuana from the age of twelve up to September 2008. (Id. at 221.) He was in inpatient rehabilitation in September 2008. (Id.) He had not been in any outpatient counseling or therapy. (Id.) He did not attend AA meetings because he was only a binge drinker. (Id.) He was self-employed, "working on computers." (Id.) He was married and had five children. (Id.) He attributed the fleas that had infested their house – the reason the State cited for removing the children – to the family "'travel[ing] a lot in the summer.'" (Id.) One summer, they had gone to Worlds of Fun thirty-three times. (Id.) They used to got to Bingo three times a week. (Id.) Plaintiff was given a variety of intelligence and personality tests. (Id. at 222-25.) Dr. Nolen's findings based on the test results include that Plaintiff was "able to maintain focus and effort to both simple and moderately complex tasks"; he paid adequate attention to

---

[14]Dr. Das' notes read that the dosage of Seroquel was to be decreased and prazosin was to be added; however, these medication changes had previously been made.

interactions with his peers; there were no indicators he had been sexually abused as a child; and he was phobic about closed places. (Id. at 222-24.) His scores on the Kaufman Brief Intelligence Test placed him in the "'average' range of intelligence." (Id. at 222.) Plaintiff denied memory lapses and auditory hallucinations. (Id. at 223.) Dr. Nolen diagnosed Plaintiff with PTSD, by life history; marijuana abuse, in brief remission by Plaintiff's report; and alcohol abuse, in brief remission by Plaintiff's report. (Id. at 225.) His GAF was 40. (Id.)

In August 2011, a Psychiatric Review Technique form was completed by Barbara Markway, Ph.D. (Id. at 380-91.) After reviewing Plaintiff's hospitalization records from November 2010 and May 2011 and the July 2011 Burrell evaluation, Dr. Markway assessed Plaintiff as having affective disorders, i.e., major depression disorder, recurrent, mild, and mood disorder, not otherwise specified, and substance addition disorders, i.e., alcohol and marijuana dependence in early remission. (Id. at 380, 383, 386.) If Plaintiff were to stop abusing alcohol, these disorders would result in mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 388.) They would not cause any episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. Markway rated Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 392.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in two of the eight listed abilities, i.e., the ability to carry out

detailed instructions and the ability to maintain attention and concentration for extended periods, and was not significantly limited in the remaining six. (Id. at 392-93.) He was moderately limited in two the five abilities in the area of social interaction, i.e.,the ability to interact appropriately with the public and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id. at 393.) He was not significantly limited in the other three abilities. (Id.) And, Plaintiff was moderately limited in one of the four abilities in the area of adaptation, i.e., his ability to travel in unfamiliar places or use public transportation, and was not significantly limited in the other three, including in his ability to respond appropriately to changes in the work setting. (Id.)

In December 2012, Dr. Das completed a Medical Assessment of Ability to Do Work (Mental) on Plaintiff's behalf. (Id. at 435-36.) In the eight activities listed for "Making Occupational Adjustments," Dr. Das rated Plaintiff as having a poor or no ability in three, including in his ability to follow work rules, use his judgment, and deal with work stresses, and a fair ability in five, including in his abilities to interact with the public, co-workers, and supervisors; to function independently; and to maintain attention and concentration. (Id. at 435.) In the three activities listed for "Making Performance Adjustments," Plaintiff had a poor or no ability in one and a fair ability in two, including in his abilities to understand, remember, and carry out detailed or simple, but not complex, job instructions. (Id. at 436.) In the four activities listed for "Making Personal Social Adjustments," Plaintiff had a poor or no ability in two and a fair ability in two, including in demonstrating reliability. (Id.) Dr. Das attributed Plaintiff's limitations to his PTSD, schizoaffective disorder, and mood fluctuations. (Id. at

435-36.) Also, he opined that the "stress of work[,] social interaction may make [it] difficult [for Plaintiff] to work and some medications may make him drowsy." (Id. at 436.)

## The ALJ's Decision

The ALJ first found that Plaintiff has not engaged in substantial gainful activity since his amended alleged disability onset date of May 17, 2011. (Id. at 12.) He then summarized in detail Plaintiff's work and disability application history, noting that he last had reported earnings in 2000, two years before his original disability onset date alleged in the pending SSI application and also two years before he filed his first set of five disability claims.[15] (Id.) The earliest disability onset date alleged in any prior applications was August 1998 and was not preceded by any period of substantial earnings. (Id.) The ALJ found that Plaintiff has an "overall very poor work history" that reflects the lack of "a consistent and compelling financial incentive to maintain full-time competitive employment." (Id.) His absences from the workforce were not because of a medical condition but were attributable, "in at least large part, to his longstanding history of polysubstance abuse rather than due to alleged physical and mental impairments." (Id. at 12-13.)

_____

[15]The five cited by the ALJ include (1) claims filed in August 2002 alleging a disability onset date of August 1998; (2) claims filed in August 2003 alleging a disability onset date of March 2000; (3) claims filed in July 2004 alleging the same disability onset date as the second set; (4) claims filed in May 2010 alleging a disability onset date of February 2009; and (5) the pending SSI application and a contemporaneous Title II application for disability insurance benefits (DIB) but technically denied on the grounds that Plaintiff did not have enough earnings to meet the disability insured status requirements. The first set were not pursued after an initial denial; the second set were denied after a hearing and not pursued further; the Title II application in the third set was denied because Plaintiff did not meet the disability insured status requirements and the Title XVI application was denied because Plaintiff failed to appear for a hearing; the Title II application in the fourth set was denied on *res judicata* grounds and the Title XVI claim was denied for lack of evidence. (Id. at 13.)

The ALJ next found that Plaintiff had a combination of impairments that were severe: "a longstanding history of marijuana and alcohol dependence disorders"; an affective disorder, variably diagnosed as a major depressive disorder, major depression, a mood disorder, not otherwise specified, depression, schizoaffective disorder or schizotypal personality disorder; a history of an anxiety-related disorder, variably diagnosed as PTSD or generalized anxiety disorder; and a history of seizures, attributable primarily to episodes of alcohol withdrawal or, once, to a new medication. (Id. at 14.) These impairments satisfied the criteria of Listing 12.09 (substance addiction disorders) as evaluated under the criteria of Listing 12.04 (depression). (Id.) Absent the limitations and restrictions caused by Plaintiff's use of illicit drugs and alcohol, Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.)

In explaining this conclusion, the ALJ reviewed the medical evidence and gave great weight to the opinion of Dr. Markway at step three of the sequential evaluation process, see pages 23 to 24, supra, about the effect of Plaintiff's substance abuse on his mental impairments and symptoms, noting that she was a licensed psychologist, she was familiar with the Listings and with the role of substance abuse in the disability evaluation process, and her opinion was consistent with the medical treatment notes and other medical records. (Id. at 15.) The ALJ found that Plaintiff's marijuana and alcohol abuse resulted in moderate restrictions in activities of daily living; marked difficulties in social functioning; and marked difficulties in maintaining concentration, persistence, or pace. (Id.) Because of his abuse, Plaintiff had also

"experienced multiple recurrent episodes of mental decompensation . . . , but no repeated episodes of decompensation." (Id.) Accordingly, he satisfied he criteria of Listing 12.04.

The ALJ further noted that, as found by Dr. Markway, the medical record reflected that Plaintiff's mental functioning "greatly and rapidly improved with detoxification from alcohol and/or marijuana and abstinence from intoxicating substances." (Id. at 16.) Absent the limitations and restrictions caused by Plaintiff's substance abuse, he had mild restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id.) He did not have any repeated episodes of decompensation of extended duration. (Id.)

Addressing Plaintiff's seizures, the ALJ noted that diagnostic imaging studies revealed no abnormalities and that other tests and examinations failed to establish an epileptiform disorder or of any seizure disorder outlined in the listings. (Id. at 16-17.) Moreover, the introduction to Listing 11.00 specifically directs that the severity of a seizure disorder may not be satisfied secondary to substance abuse or non-compliance with medications. (Id. at 17.)

The ALJ then determined that, absent the substance abuse, Plaintiff had the residual functional capacity (RFC) to perform the full range of work at all exertional levels but with nonexertional limitations of (a) understanding, remembering, and carrying out simple work instructions or tasks; (b) having no more than occasional contact with the general public; (c) not being exposed to unprotected heights or dangerous machinery; and (d) not using motorized driving equipment as a primary job duty. (Id.) He could have up to frequent contact with coworkers and supervisors. (Id.)

In making this determination, the ALJ evaluated Plaintiff's credibility. (Id. at 17-33.) He found that there was no evidence supporting Plaintiff's claim of debilitating back pain. (Id. at 17-18.) Plaintiff's claim of multiple personalities was not supported by a related diagnosis, was not supported by the medical evidence, and was doubted by the mental healthcare specialists. (Id. at 18.) The ALJ found that this claim suggested "a proclivity for willful misrepresentation." (Id.) Plaintiff's claims that his impairments adversely affected his abilities to follow instructions, complete tasks, remember, concentrate, and get along with others was contradicted by his other statements in the record. (Id. at 19.) The ALJ next detailed the various inconsistencies in Plaintiff's reports of when he stopped drinking alcohol, finding that these inconsistencies also reflected a proclivity for willful misrepresentation. (Id. at 20-22, 24.) He noted that Plaintiff had little treatment in late 2009 and 2010. (Id. at 23-25.) Other inconsistencies included Plaintiff's varying reports of auditory or visual hallucinations; his report of social paranoia and use of dating sites and having multiple girlfriends; his request to resume taking Celexa and his delay in doing so; his report to Dr. Conley that he had been out of his medications for a week and his report to a Burrell provider the next week that he had been out of his medications for four months; his report of hallucinations to Dr. Crawford followed by his specific denials of such; his claimed desire to regain custody of his children and his failure to participate in the substance abuse treatment programs required for him to do so. (Id. at 26, 27-29.) The record reflected Plaintiff's consistent non-compliance with his medications. (Id. at 27.) The ALJ considered that the reference to the court waiting to pursue

Plaintiff for back-owed child support until he received disability might provide Plaintiff a financial motivation to willfully misrepresent his condition.  (Id.)

Addressing Dr. Das' assessment of Plaintiff's mental limitations, the ALJ found it to be internally inconsistent and inconsistent with the medical record, including Dr. Das' own treatment notes.  (Id. at 31-32.)  For instance, Dr. Das opined that Plaintiff had a poor or no ability to follow work rules, use judgment, or deal with work stresses, but also that he had a fair ability to understand, remember, and carry out simple or detailed job instructions.  (Id.)  He opined that Plaintiff had a poor or no ability to relate predictably in social situations, but did not reconcile that conclusion with Plaintiff's involvement with online dating and several girlfriends.  (Id. at 32.)

Without the limitations and restrictions caused by his substance abuse, Plaintiff had the RFC to perform his past relevant work as a small parts assembler as that job is performed in the national economy.  (Id. at 33.)  With his age, GED, and RFC absent the limitations caused by his substance abuse, Plaintiff also could preform the jobs outlined by the VE.  (Id. at 33-34.)  Absent his substance abuse, Plaintiff would not, therefore be disabled.  (Id. at 35.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to

last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'"  **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.

**Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the

inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). "An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as []he actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). "At this step the ALJ may use a VE to assist him in making that decision by providing expert advice." **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred when accepting the assessment of Dr. Markway and rejecting that of Dr. Das.[16] The Commissioner counters that the ALJ's determination that

---

[16]Plaintiff also argues that the ALJ erred by finding his employment from May 1999 to June 2000 with Archer Tool Company was substantial gainful activity. Substantial gainful activity is presumed if the claimant's average earnings are greater than a set amount. See **Comstock v.Chater**, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.974(a)(1). Earnings that ordinarily show a claimant is engaged in substantial gainful activity were $700 per month in 1999 and also in 2000. Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (last visited Jan. 28, 2015). Plaintiff worked for Archer for thirteen months for a total of $7,393 and an average monthly salary of $568.69. Thus, Plaintiff's work with Archer was not substantial gainful activity. Consequently, that work is not past relevant work. 20 C.F.R. § 416.920(b)(1). This error does not, however, require

Plaintiff would not be disabled but for his substance abuse is supported by substantial evidence on the record as a whole.

Title 42 U.S.C. § 1382c(a)(3)(J) provides that "[a]n individual shall not be considered to be disabled for purposes of [SSI] if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." "In the case of alcoholism and drug addiction, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability." **Kluesner v. Astrue**, 607 F.3d 533, 537 (8th Cir. 2010). "If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of substance abuse." **Id.** The relevant question is not only if the claimant's substance abuse was in remission at the time of the hearing, but is whether it was active during much of the relevant period. **Id.** at 538; **Vester v. Barnhart**, 416 F.3d 886, 890 (8th Cir. 2005). "The claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor." **Kluesner**, 607 F.3d at 537. The claimant meets this burden if the ALJ "'is unable to determine whether substance abuse disorders are a contributing factor to the claimant's otherwise-acknowledged disability . . . .'" **Id.** (quoting Brueggerman v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003)).

In the instant case, the ALJ determined that Plaintiff's affective disorder, history of an anxiety-related disorder, and history of seizures satisfied Listing 12.09 as evaluated under the criteria of Listing 12.04. Listing 12.09, substance addiction disorders, is applicable when

---

that the Commissioner's decision be reversed because the ALJ also relied on unchallenged testimony by the VE outlining jobs that Plaintiff can perform with his RFC.

there are "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.09. The required level of severity for the disorders is met when the requirements of one of nine listed disorders are met, including Listing 12.04 for affective disorders. See Id. See also **Pettit v. Apfel**, 218 F.3d 901, 902 (8th Cir. 2000) (noting that an ALJ must find that a claimant met the requirements of at least one of a number of other specified listings, including Listing 12.04, to meet the requirements of Listing 12.09). Listing 12.04 requires, as relevant, "persistence, either continuous or intermittent," of "[d]epressive syndrome characterized by at least four of the following:

> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or
>
> d. Psychomotor agitation or retardation; or
>
> e. Decreased energy; or
>
> f. Feelings of guilt or worthlessness; or
>
> g. Difficulty concentrating or thinking; or
>
> h. Thoughts of suicide; or
>
> i. Hallucinations, delusions, or paranoid thinking."

20 C.F.R. Pt. 404, Subpt. P. App.1, § 1204. These symptoms must result in at least two of the following: (1) "[m]arked restriction of activities of daily living"; (2) "[m]arked difficulties in maintaining social functioning"; (3) "[m]arked difficulties in maintaining concentration,

persistence, or pace"; or (4) "[r]epeated episodes of decompensation, each of extended duration." Id.

The ALJ's determination that Plaintiff satisfied the criteria of Listing 12.04 is not challenged by either party. What is challenged is whether the ALJ erred in finding, as did Dr. Markway, that absent Plaintiff's substance abuse he would not do so. Citing Dr. Das' assessment and Social Security Ruling 06-3p, Plaintiff argues the ALJ did err.

The introductory paragraph to Social Security Ruling 06-3p explains that "all of the available evidence in the individual's case record" will be considered during the disability determination. Social Security Ruling 06-3p, 2006 WL 2329939, *1 (S.S.A. Aug. 9, 2006). "This includes, but is not limited to, objective medical evidence; other evidence from medical sources, including their opinions; . . . and decisions by other governmental and nongovernmental agencies about whether an individual is disabled or blind." Id. When weighing medical opinions from treating sources, e.g., Dr. Das, nontreating sources, and nonexamining sources, e.g., Dr. Markway, the following are the factors to be considered:

• The examining relationship between the individual and the "acceptable medical source";

• The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;

• The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;

• How consistent the medical opinion is with the record as a whole;

• Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and

• Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an "acceptable medical source" has, regardless of the source of that understanding, and the extent to which an "acceptable medical source" is familiar with the other information in the case record, are all relevant factors that we will consider in deciding the weight to give to a medical opinion.

Id. at *2-3. This Ruling further requires that "[e]ach case . . . be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." Id. at *5. Thus, "depending on the particular facts in a case," the opinion of a nonexamining source may outweigh the opinion of a treating source. Id. When an ALJ decides thus, he must explain his reasons. Id. at *6. See **Willcockson v. Astrue**, 540 F.3d 878, 880 (8th Cir. 2008) (ALJ erred in not explaining the weight given to the assessment of nonexamining state medical consultant as such explanation would have complied with regulation and assisted in review of adverse decision).

Contrary to Plaintiff's position, consideration of the factors listed in Social Security Ruling 06-3p do not mandate a reversal of the ALJ's decision for the reasons set forth below.

The first two factors – the examining and treatment relationships – do favor Plaintiff's argument. Dr. Das had treated Plaintiff two times, once in July 2012 and once in September 2012, before completing his assessment. Dr. Markway never saw Plaintiff.

The third factor – the explanation given by the "acceptable medical source," i.e., Dr. Das, and the evidence supporting his opinion – does not favor Plaintiff's argument. When first

examined by Dr. Das, in July 2012, Plaintiff attributed problems he was having with sleeping and confusion to medication side effects. On examination, he was cooperative and had good eye contact, normal speech, a euthymic mood and congruent affect, linear and goal-directed thought processes, intact memory, and fair insight and judgment. Dr. Das diagnosed Plaintiff with, inter alia, alcohol and marijuana dependence in sustained full remission. When Dr. Das next, and last, saw Plaintiff, Plaintiff complained of continuing sleeping problems but was as before on examination. His diagnoses were unchanged. Thus, the examination findings and diagnosis are consistent with Dr. Markway's assessment that Plaintiff would not have marked difficulties in functioning were he to stop drinking.

Moreover, Dr. Das' explanation for his December 2012 assessment is wanting. Having found at his two examinations of Plaintiff that he had fair insight and judgment, three months after the last of the two he assessed Plaintiff as having poor judgment. He assessed Plaintiff as having a fair ability to understand, remember, and *carry out* simple or detailed work instructions, but also concluded that he had a poor ability to follow work rules. He assessed Plaintiff as having a fair ability to interact with co-workers, the public, and supervisors, but concluded that "social interaction *may* make [it] difficult [for him] to work." (R. at 436; emphasis added.) See **Turbin v. Colvin**, 750 F.3d 989, 994 (8th Cir. 2014) ("A treating physician's opinion is not automatically controlling and may be discredited when other medical opinions are supported by better medical evidence or when the physician gives inconsistent opinions.").

The fourth factor – the consistency of the medical opinion with the record as a whole – lends weight to Dr. Markway's opinion and not to Dr. Das'. The record is replete with references to Plaintiff's alcoholism and, to a lesser extent, his drug use. He is consistently diagnosed with alcohol-related conditions. His reports to health care providers of when, and if, he stopped drinking vary. During the period when he is clearly drinking, his truthfulness is questioned more than once. The record also supports a conclusion that Plaintiff stopped drinking at some point after his amended alleged disability onset date. He thereafter was described as "doing fairly well" or "doing well." He was much less depressed; and, at times, what depression there was was attributable to specific situations, e.g., his mother's financial difficulties or his court case for back-owed child support.

The fifth factor – the speciality of the "acceptable medical source" and whether the opinion is about medical issues related to that speciality – weighs equally in favor of the two assessments. It weighs in favor of Dr. Das because he is an "acceptable medical source" and a psychiatrist. His opinion, however, that stress of work and social interaction will make it difficult for Plaintiff to work is about an issue unrelated to that speciality. Indeed, it is about an issue that is reserved for the Commissioner. See **Ellis v. Barnhart**, 392 F.3d 988, 994 (8th Cir. 2013) ("A medical source opinion that an applicant is . . . 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").

The sixth, "catch-all," factor favors Dr. Markway's opinion. Dr. Markway is familiar with the disability program, its evidentiary requirements, and how and when a claimant's

alcohol or drug abuse is to be considered. Plaintiff argues that Dr. Das' assessment should control because he has access to Plaintiff's Burrell records, records which establish a longitudinal picture of Plaintiff's impairments. That picture, however, does not support Dr. Das' assessment. As discussed above, the assessment conflicts with Dr. Das' own treatment notes. Two months before Plaintiff first saw him, he saw Ms. Earlywine and was reportedly doing well. His depression was a three on a ten-point scale. And, he attributed his stress to a situation, i.e., his mother's financial circumstances. The Burrell record before that also describes Plaintiff as "doing fairly well." These records are from a period when there is no indication that Plaintiff was drinking. The records support Dr. Markway's assessment rather than Dr. Das'. Cf. **McCoy**, 648 F.3d at 616 (8th Cir. 2011) (rejecting claimant's argument that the ALJ had erred by not finding he had a stooping limitation as found by nonexamining consulting physician when that physician did not have access to the records of claimant's treating physician who found no significant postural limitations).

In his 27-page decision, the ALJ detailed the record, considered the relevant factors, and determined that Plaintiff was not disabled when not abusing alcohol or drugs. In other words, "the ALJ exhaustively reviewed the record medical evidence and made factual findings regarding this evidence. '[T]here is no indication that the ALJ felt unable to make the assessment he did . . . .'" **Martise v. Astrue**, 641 F.3 909, 927 (8th Cir. 2011) (quoting Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)) (first alteration in original). "Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the

existence and severity of an impairment." **Kamann v. Colvin**, 721 F.3d 945, 950 (8th Cir. 2013).  For the reasons set forth above, Plaintiff has failed to carry this burden.

## Conclusion

Considering all the evidence in the record, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959,  964 (8th Cir. 2010).  Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.  An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  2nd  day of February, 2015.